**VITAL STATE CANADA, LTD.,
and Confab Laboratories,
Inc., Plaintiffs,**

v.

**DREAMPAK, LLC, Aly Gamay, Terrance Schneider, Justin Gauvin, Temco Packaging, Inc., "Chuck" Goldberg d/b/a/ Temco Packaging, John Doe, and XYZ Corporation, Defendants.**

**Civil Action No. 03–1760 (JAG).**

United States District Court,
D. New Jersey.

Dec. 30, 2003.

**518**

Steven M. Kaplan, Ashima Aggarwal, Paul R. Levenson, Kaplan & Levenson LLP, New York City, for Plaintiffs.

Vincent Lodato, Loryn P. Riggiola, Sills, Cummis, Radin, Tischman, Epstein & Gross, Newark, NJ, Allen C. Schlinsog, Daniel Kelly, Paul J. Stockhausen, Reinhart Boerner Van Deuren, Milwaukee, WI, for Defendants DreamPak, LLC, Aly Gamay, Terrance Schneider and Justin Gauvin.

## REVISED OPINION

GREENAWAY, District Judge.

This matter comes before the Court on two preliminary injunction applications. Plaintiff Vital State Canada, Ltd. ("Vital State") seeks a preliminary injunction against the following defendants: Dream-Pak, LLC ("DreamPak"), Aly Gamay ("Gamay"), Terrance Schneider ("Schneider"), Justin Gauvin ("Gauvin"), Temco Packaging, Inc. ("Temco"), Charles "Chuck" Goldberg ("Goldberg"), John Doe and XYZ corporation (collectively "Defendants"). Vital State seeks to preliminarily enjoin defendants from violating a confidentiality agreement and misappropriating trade secrets. DreamPak seeks to preliminarily enjoin Vital State from violating the confidentiality agreement and misappropriating trade secrets. For the reasons set forth below, this Court DENIES both Vital State's and DreamPak's applications for preliminary injunctions.

### *INTRODUCTION*

Vital State Canada, Ltd. is a Canadian corporation with its principal place of business in Montreal, Quebec. DreamPak, LLC is a Virginia limited liability company with a factory in Wisconsin (the parties dispute whether any of the events in this case took place in Virginia). Gamay and Schneider are officers of DreamPak. Gauvin is a sales manager employed by DreamPak. Temco is a New Jersey corporation, and Goldberg does business as Temco Packaging. Confab is a Canadian corporation doing business principally in Quebec.

In approximately April, 2002, Vital State took a formulation for a creatine supplement and approached DreamPak to discover whether DreamPak could manufacture it. After forming an oral confidentiality agreement, Vital State began to disclose to DreamPak information relating to the formulation. On April 18, 2002, it disclosed to DreamPak a particular formulation ("the 4/18 formula"). On or about May 13, 2002, the parties signed a confidentiality agreement ("Confidentiality Agreement"). On or about May 17, 2002, the parties signed the "Trial Run Agreement." This Trial Run Agreement expressly incorporated, and is subject to, the Confidentiality Agreement. Although the Trial Run Agreement provides that Wisconsin law governs that agreement, the Confidentiality Agreement has no governing law provision.

The two companies worked together through June, 2002, when DreamPak was able to complete successfully trial run production of the creatine supplement. This involved communication through telephone and email between Vital State employees in Quebec and DreamPak employees in Virginia and Wisconsin, as well as visits by Vital State employees to the DreamPak factory in Wisconsin. After completion of the trial runs, the companies attempted to negotiate a manufacturing contract, but were unable to reach agreement.

At an unknown point, DreamPak formulated and produced samples of a product named "Creatine Crunch." In March, 2003, Chuck Goldberg, a manufacturing

representative doing business as Temco Packaging, contacted Rexall Sundown, Inc., offering samples of DreamPak's Creatine Crunch.

On April 22, 2003, Vital State filed the instant suit, seeking various forms of relief, including a permanent injunction against DreamPak. On April 23, 2003, this Court issued a Temporary Restraining Order against DreamPak, enjoining it, *inter alia,* from manufacturing and selling Creatine Crunch or any product derived from proprietary information disclosed to it by Vital State under the Confidentiality Agreement. An amended complaint filed on May 5, 2003 lists six causes of action; Vital State relies on only the first two, alleging breach of the Confidentiality Agreement and misappropriation of trade secrets, in this preliminary injunction motion. On May 30, 2003, DreamPak moved for a preliminary injunction against Vital State.

## *ANALYSIS*

### I. Governing Legal Standards

#### A. *Standard for Preliminary Injunction Applications*

■ The grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989). Generally, in determining whether to grant a preliminary injunction or a temporary restraining order, courts in this Circuit review four factors:

> (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*S & R Corp. v. Jiffy Lube Intl. Inc.,* 968 F.2d 371, 374 (3d Cir.1992) (citing *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197–98 (3d Cir.1990)). The applicant must meet its burden on the first two factors before the Court will consider the third and fourth elements. *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985). All four factors should favor relief before an injunction will issue. *S & R Corp.,* 968 F.2d at 374, (citing *Hoxworth,* 903 F.2d at 192).

#### B. *Standard for Determining Governing Law*

■ A district court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The New Jersey Supreme Court has established these choice of law rules:

> [T]he determinative law is that of the state with the greatest interest in governing the particular issue. The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis. If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

*Veazey v. Doremus,* 103 N.J. 244, 248, 510 A.2d 1187 (1986).

Vital State states a tort claim in its second cause of action for misappropria-

tion of trade secrets. The New Jersey Supreme Court has recently reviewed choice-of-law determination in tort actions and recognized a rebuttable "presumption that the law of the situs state prevails." *Erny v. Estate of Merola,* 171 N.J. 86, 100, 792 A.2d 1208 (2002). When the conduct and the injury occurred in different states, this presumption may be overcome through the governmental interest analysis. *Id.* In the instant case, Third Circuit law would consider the situs of injury to be Quebec, as Vital State is a Canadian corporation headquartered in Quebec. In *Horne v. Adolph Coors Co.,* 684 F.2d 255, 259 (3d Cir.1982), the Third Circuit held that "insofar as the situs of the property damaged by the alleged wrongdoing is a concern, both a state trade secret and a patent should be deemed to have their fictional situs at the residence of the owner." *But see BP Chemicals Ltd. v. Formosa Chemical,* 229 F.3d 254 (3d Cir.2000) (citing *Horne* but concluding that the law of the place where the conduct occurred should prevail).

## II. Vital State's Application for a Preliminary Injunction

### A. *Threshold Issue: Choice of Law*

Following *Veazey,* a dispute must be analyzed issue by issue. Under the two-step New Jersey choice-of-law analysis, the first step involves determining whether a conflict exists between the law of the interested states. In the present case, the interested states are Virginia, Wisconsin, and Quebec. Vital State's application for injunctive relief rests upon causes of action for misappropriation of trade secrets and breach of contract. Although the parties do not agree which state's law should govern, they agree that the relevant areas of trade secret and contract law present no conflicts.

For both the misappropriation and breach of contract causes of action, the fundamental issue is whether Vital State possessed any trade secrets: if Vital State does not show a likelihood of success in establishing that it possessed trade secrets, it cannot obtain injunctive relief. The choice of law analysis need only address the issue of the legal definition of a trade secret.

Both Wisconsin and Virginia have adopted versions of the Uniform Trade Secrets Act that do not differ materially in the definition of a trade secret. *Compare* Wis. Stat. 134.90 (2001–02) and Va.Code Ann. 59.1–336 (2001). Quebec has no statutory definition of trade secrets, and the two published Quebec provincial court trade secret cases do not provide a definition.[1] There is one federal court case, however, from a federal trial court seated in Quebec, that does define the elements of a trade secret claim, *Consolidated Textiles Ltd. v. Central Dynamics Ltd.,* [1974] 2 F.C. 814, 1974 WL 156179. One of the four elements is: "The alleged secret must not have been known to people knowledgeable in the art at the time." *Id.* at par. 36. This element is not materially different from the element of the Uniform Trade Secrets Act definition that states that trade secret information is not … generally known to … other persons who can obtain economic value from its disclosure or use. Wis. Stat. 134.90(1)(c)(1) (2001–

---

**1.** The structure of the Canadian Court system parallels that of the United States: cases under provincial law are brought in the provincial courts, and appealed to the provincial superior court and court of appeals; cases under federal law are brought in the trial division of the federal courts, and appealed to the federal court of appeal. The Supreme Court of Canada provides the highest appellate level for both the provincial and federal systems.

02).[2] Because this application for a preliminary injunction can be decided on this one element alone, and the laws of the interested states do not differ materially on this element, no conflict exists between the law of the interested states. The Court need not reach the second step of the choice-of-law analysis.

B. *Vital State has not demonstrated a likelihood of success on the merits.*

1. **Vital State has not demonstrated a likelihood of success in establishing a specific and consistent definition of the proprietary information it seeks to protect.**

In the complaint filed April 22, 2003, Vital State claimed that its "Actijube Technology" constituted trade secrets and that aspects of its manufacturing process and composition were proprietary, but it did not offer any specific definitions of those proprietary characteristics. None of the documents accompanying the application for injunctive relief—the memorandum of law, the declarations of Heather Baker and Jonathan Farber—defined the specific trade secrets Vital State claimed, beyond the assertion that the Actijube Technology constituted trade secrets. Although the Farber declaration offered a detailed argument that similarities in the formulas for DreamPak's Creatine Crunch and Vital State's creatine supplement provided "compelling evidence" that Dream-Pak had copied the Actijube Technology, it did not identify the specific trade secrets that it alleged had been copied. (Farber Dec. ¶ 25). This deficit is a recurring theme in Vital State's case: it has offered exhaustive detail about the similarities between the two companies' formulas, but has not rested the similarity argument on the necessary foundation of a specific and consistent definition of the trade secrets it claims.

Vital State gave its first detailed definition of its trade secret claims in its memorandum of law in opposition to DreamPak's application for a preliminary injunction:

Vital State, in discussions with Dream-Pak, also provided Confidential Information and trade secrets including: (a) various solvent blends (i.e. propylene glycol, glycerine, glycerol) that could be used to disperse and incorporate creatine into the finished Actijube ... (b) temperatures that had to be achieved for effective combination of the solvent components ... and the gelling components ... (c) the need to reduce the temperature of the gelling components after hydration and prior to addition of the creatine solvent blend; (d) the optimum temperature at which the product should be filled while maintaining flow through the pumping system to the Unifill machine; (e) the requirement of properly measuring the water ... and how to correct the formula to achieve the desired moisture content; and (f) equipment additions to DreamPak's existing production set-up that would facilitate commercial production of the Actijube.

(Opp.Brief—p.10). Thus, Vital State claimed six discrete elements of the composition and manufacturing process as trade secrets.

At the preliminary injunction hearing on September 24, 2003, Vital State defined

**2.** In its post-hearing reply brief, Vital State argues incorrectly that the Wisconsin and Virginia statutes require that a trade secret be "not readily available." (Post–Hearing Reply Br.—p. 2). The correct statutory language, "not being generally known to, and not being readily ascertainable by proper means by, other persons" states a very different standard. Wis. Stat. 134.90 (2001–02); Va.Code Ann. 59.1–336 (2001).

quite differently the specific information it claimed as trade secrets: 1) "controlling the environment" of a gelatin delivery vehicle, particularly by lowering the water activity and the pH, so that an active ingredient would be protected during manufacturing and have high bioavailability when consumed; 2) the use of glycerine, glycol, or propylene glycol (later referred to as "polyols") as a solvent in a creatine supplement, which bind water and protect the creatine from damage by water; and 3) the use of corn syrup to hydrate gelatin instead of water, thus lowering the water activity level.[3] (Hearing Transcript—p. 105).

The first trade secret claim, for "controlling the environment," appears overbroad and vague.[4] As stated, "controlling the environment" is a concept with nearly unlimited coverage of gelatin product formulations. The lack of specificity of the key term "environment," and the absence of detail as to exactly what is controlled and how, makes this a claim that lacks clear definition. It would be impossible to fashion delimited injunctive relief if Vital State were allowed ownership of a concept without clear boundaries.

The second and third trade secrets claimed were clearly defined at the hearing on September 24, but the claims changed at the subsequent hearings and in the post-hearing brief. At the September 24 hearing, Vital State had claimed that the second trade secret involved the use of polyols, with primary emphasis on their use as a solvent to dissolve the creatine, and secondary emphasis on their use to lower water activity level.[5]

At the October 27, 2003 hearing, Vital State did not refer to the claimed use as a solvent, and now gave primary emphasis to the use to lower water activity level. Further, Vital State admitted that "the fact that polyols lower water activity is not novel to Vital State ... The use of these polyols in a hydrocolloid delivery system is." (10/27/03 Hearing Transcript—pp. 27, 28). Vital State claimed that no one before them had ever used polyols in a hydrocolloid product. (10/27/03 Hearing Transcript—p. 28). Moreover, Vital State made a major shift, claiming that the trade secret was the combination of the elements, and not each element separately. Thus, it shifted from claiming a group of trade secrets to claiming one trade secret, the combination.[6] It also shifted from defining the end product as a gelatin delivery vehicle to a hydrocolloid delivery system.

3. In its memorandum of law in opposition to DreamPak's application for a preliminary injunction, Vital State claimed that it was "first to use high fructose corn syrup to hydrate gelatin without the addition of significant water." (Opp.Brief—p.5–6).

4. Moreover, Vital State's claim for "controlling the environment" as a trade secret is seriously undermined by its subsequent admission that it did not invent any of the elements of controlling the environment, particularly control of pH and water activity.

5. In addition, in its memorandum of law in opposition to DreamPak's application for a preliminary injunction, Vital State claimed as a trade secret "various solvent blends (i.e.

propylene glycol, glycerine, glycerol) that could be used to disperse and incorporate creatine into the finished Actijube, quantities of solvents to be used and the reasoning behind Vital State's use of a blend of glycerol and propylene glycol." (Opp.Brief—p. 10). In this quote, the primary emphasis is on the use of polyols as solvents for the creatine, rather than to control water activity.

6. This appears to represent Vital State's final position. In its post-hearing memorandum of law, Vital State wrote: "[T]he Actijube Technology draws from a 'tool chest' of known scientific principals [sic] and combines and implements them in a unique and novel way." (Post–Hearing Mem.—p. 2).

In the final hearing on November 10, 2003, Vital State again maintained that it claimed one trade secret in its proprietary combination of known principles. Yet it offered a lengthy analysis of DreamPak's history of product formulations directed at the use of the discrete elements (polyols, high fructose corn syrup) it had defined at the September 24, 2003 hearing.

In its post-hearing memorandum of law, Vital State's definition of its trade secret shifted again. In contrast to the definition used at the October 27, 2003 hearing, which had focused on the use of polyols and high fructose corn syrup in a hydrocolloid delivery system, the definition in this final memorandum focuses on the combination of ingredients in a gummy product:

> First, Vital State recognizes that the use of (i) solvents as humectants, (ii) buffering agents to modify or control pH, (iii) starches, hydrocolloids and other carbohydrates to provide structure and texture; or (iv) sugar syrups as sweeteners and humectants are not, *each standing alone,* novel concepts. However, the use of various combinations of these in a gummy product designed to incorporate sensitive bioactives is unprecedented, novel and protectable.

(Post–Hearing Mem.—p. 6). Hydrocolloids have changed from being the end product to being an ingredient used in a different end product, a gummy.

With all these shifts and changes, Vital State has not shown a likelihood of success in establishing a specific and consistent definition of the proprietary information it seeks to protect. Having heard a variety of definitions over the course of this case, this Court is unable to determine with the needed clarity and precision exactly what information Vital State wishes to protect.

The requirement that trade secrets must be specifically defined to be protected is common to the law of the interested states. *See Consolidated Textiles Ltd. v. Central Dynamics Ltd.,* [1974] 2 F.C. 814, 827, 1974 WL 156179 (Quebec: "Whether the subject-matter of the alleged secret is . . . specific enough . . . to be capable of being afforded protection at law as a trade secret."); *IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581 (7th Cir.2002) (Under Wisconsin law, trade secrets must be identified and specific; broad and vague statements are insufficient); *3M v. Pribyl,* 259 F.3d 587, 595 n. 2 (7th Cir.2001) (Under Wisconsin law, "[t]he plaintiff must point to concrete secrets.") In none of the interested states would the law allow a Court to enjoin the use of information that has not been clearly and specifically identified.

### 2. Vital State has not demonstrated a likelihood of success in showing that the claimed trade secrets are not generally known to others.

The obstacle posed by the lack of a clear definition of the claimed trade secrets becomes apparent when trying to determine whether the information meets the legal test for a trade secret. Whether considering the discrete elements claimed by Vital State, or the combination, Vital State has not met its burden of showing a likelihood of success in establishing that the information was not generally known to others. There are four possible trade secret claims to evaluate: 1) the use of polyols as solvents or to lower water activity in a creatine supplement;[7] 2) the use of high fructose corn syrup to hydrate

---

7. As noted above, Vital State admitted before the Court that they did not invent or discover the use of polyols to lower water activity.

With this admission, they effectively withdrew this claim from consideration as a trade secret.

gelatin in a creatine supplement;[8] 3) the combination of the first and second elements in gelatin food supplements; and 4) the use of polyols and high fructose corn syrup in combination to lower water activity in hydrocolloid food supplements. DreamPak offered four kinds of evidence of the public availability of this knowledge: a) the Green patent; b) the Farber deposition; c) the published Vital State patent applications; and d) the Labuza certification.

### a. The Green Patent

DreamPak argued that the 1997 Green patent, number 5,773,473, demonstrates the public knowledge of the information claimed by Vital State as a trade secret. This patent for a creatine supplement claims the discovery of mixing creatine with propylene glycol to increase bioavailability, and contemplates adding many other ingredients to the composition, including a binder such as gelatin. Thus, this patent demonstrates knowledge of the first claimed trade secret, the formulation of a creatine supplement with a polyol. As already noted, Vital State later effectively withdrew this claim.

### b. The Farber Deposition

Dreampak points to the admission of Jonathan Farber that the use of syrups as a replacement for water has been done before, and that it is not Vital State's confidential information. (Farber Dep. Vol. I, p. 132, ln. 10–17). This seriously weakens Vital State's claim for the second trade secret, the use of high fructose corn syrup to hydrate gelatin, as that is a use of a syrup as a replacement for water. As already noted, Vital State later effectively withdrew this claim.

### c. The Vital State Patent Applications

DreamPak argued that Vital State placed its trade secrets into the public domain when the P.T.O. published its two patent applications. Vital State had previously filed two patent applications, WO 03/026438 and WO 03/026439, published by the U.S.P.T.O. on April 3, 2003, following approximately the normal 18–month waiting period. The first claim of the '439 application claims:

1. An oral delivery system for creatine formulations comprising one or more sources of creatine substantially uniformly dispersed in a matrix, said matrix comprising: (a) one or more sugar syrups; (b) one or more modified starches; (c) a hydrocolloid component comprising gelatine or a combination of gelatine and gellan; (d) a solvent comprising glycerol, ... propylene glycol, or a combination thereof ...

Claim 15 specifies that the sugar syrup is a corn syrup, and, in the specification, section 1.2 on sugar syrup explains that high fructose corn syrup may be used, and that it can play an important role in water activity.

■ DreamPak argued that these patent applications disclose the elements claimed by Vital State as trade secrets, both individually and in combination, and Vital State did not refute this. At the hearing on October 27, the Court asked Dr. Margaret Swain, the patent attorney who drafted these applications for Vital State, what trade secrets had *not* been disclosed by these applications. Dr. Swain's answer did not reveal any specific

---

8. Again, Vital State admitted before the Court that they did not invent the use of high fructose corn syrup to lower water activity, thus effectively withdrawing this claim from consideration as a trade secret as well.

undisclosed confidential information. Moreover, Vital State attempted to answer this crucial question in its post-hearing memorandum of law, but did not provide specific information: "The patents do not disclose, *inter alia:* (a) that to make Acti-jubes with active ingredients other than creatine, or in different manufacturing environments, a completely different gel matrix may be necessary, or (b) how to modify the gel matrix and its processing to accommodate such changes." This answer does not give this Court a clear definition of the trade secret that Vital State seeks to protect.[9] Vital State thus presented insufficient evidence to counter the inference that the publication of these patent applications placed all four of the possible trade secrets into the public domain as of April 3, 2003.

Maintenance of secrecy is essential to preserve trade secret status. 1–1 Milgrim on Trade Secrets § 1.06. Milgrim states: "To the extent that the patent application/patent issuance process actually results in disclosure of a trade secret, that will, in most instances, result in prospectively terminating the trade secret." *Id.*

■ Thus, whatever the trade secret status of the four potential trade secrets may have been prior to April 3, 2003, the publication of the patent applications on this date disclosed the information to the public. Under provision 5(b) of the Confidentiality Agreement, this ends all of DreamPak's obligations with regard to proprietary information:

5. Neither Party shall have any obligation hereunder with respect to any Confidential Information disclosed by the other Party which:

a) at the time of disclosure, is already available or known to the public;

b) after disclosure, becomes available or known to the public through no fault of the receiving Party or its affiliates, or by their respective directors, officers, employees and agents;

Because the information became available to the public through no fault of DreamPak's, this provision releases DreamPak from any further obligation under the agreement, which, under other provisions, restricts the use and disclosure of confidential information. In entering this contract, Vital State agreed to release DreamPak from any obligation of confidentiality upon the occurrence of the condition, which occurred. Vital State has not argued any invalidity of this agreement; rather, it seeks enforcement of the contract. This agreement bars Vital State from making any claim of post-publication obligation against DreamPak with regard to proprietary information, and prevents the issuance of injunctive relief.

Vital State attempted rebuttal at oral argument by citing *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3d Cir. 1985), as authority for the proposition that disclosure of confidential information in a patent application does not destroy trade secret status of that information. This misstates the holding of *SI Handling,* a case decided before the patent law changed and the P.T.O. was not required to publish pending patent applications after 18 months, as it is today. In *SI Handling,* the court held that disclosure of confidential information to the P.T.O. in an application, *while it is kept confidential by the P.T.O.,* will not destroy the trade secret status of that information. The court

---

9. Even in its post-hearing reply brief, Vital State claimed that the patent applications did not disclose its trade secret, but gave no statement of what specific information they did not disclose. (Post–Hearing Reply Br.—p. 4).

did not hold that trade secret status could remain intact after public disclosure of a patent application. The citation is thus inapposite.

In its post-hearing memorandum of law, Vital State argued that publication is irrelevant, because Dreampak misappropriated the trade secrets prior to publication. Provision 5(b) of the Confidentiality Agreement prevents this argument from succeeding in a suit for injunctive relief: Vital State entered into a contract in which it agreed that its public disclosure releases DreamPak from obligation. Having made the disclosure and effected a release, it cannot now claim an obligation. The argument that misappropriation occurred prior to publication might have merit in a suit for pre-publication damages, but not for post-publication injunctive relief.

In its post-hearing reply brief, Vital State cites additional cases, all of which fail to substantiate its legal argument. For example, *Shellmar Products Co. v. Allen–Qualley Co.*, 87 F.2d 104 (7th Cir. 1936), *cert. denied*, 301 U.S. 695, 57 S.Ct. 923, 81 L.Ed. 1350 (1937), does not rely on any statute conforming to the Uniform Trade Secrets Act. More crucially, however, its holding actually works against Vital State: the court found an ongoing pre-publication duty of confidence between the parties and a breach of that obligation. In the instant case, Vital State has, under the terms of the Confidentiality Agreement, released DreamPak from ongoing obligation to it. No such release occurred in *Shellmar*.

The same holds true for *Forest Laboratories, Inc. v. Formulations, Inc.*, 299 F.Supp. 202 (E.D.Wis.1969), *aff'd in relevant part*, 452 F.2d 621 (7th Cir.1971) and *Kilbarr Corp. v. Business Systems, Inc.*, 679 F.Supp. 422 (D.N.J.1988). In each of these cases, the court found a pre-publication confidential relationship, continuing in operation post-publication, between the parties. Because Vital State agreed to release DreamPak from obligations of confidence upon publication, it cannot now seek to enforce any such duty.

#### d. The Labuza Declarations

DreamPak offered two declarations from Theodore P. Labuza, Ph.D., Professor of Food Science in the Department of Food Science and Nutrition at the University of Minnesota. In these declarations, Dr. Labuza stated that the use of polyols and high fructose corn syrup to control water activity has been well-known to food science for decades, and that hydrocolloid formulations incorporating water-sensitive bioactive ingredients with polyols and high fructose corn syrup have been publicly available for a significant period of time. In particular, Dr. Labuza observed that Lotte Ginseng gum is a publicly available hydrocolloid product incorporating a bioactive ingredient that uses corn syrup and glycerine to control water activity. (Labuza Supp. Dec.—¶ 4(j)). Also, Dr. Labuza observed that both Dimetapp DM Cold & Cough Elixir and Vick's Nyquil Multi–Symptom Cold/Flu Relief are widely available pharmaceutical products incorporating polyols and high fructose corn syrup to control water activity, protecting water-sensitive bioactive ingredients. (Labuza Dec.—¶ 23). These statements strongly support DreamPak's arguments that the use of polyols and high fructose corn syrup to lower water activity, singly and in combination, in pharmaceuticals and in hydrocolloid formulations, was generally known in the art prior to any disclosure by Vital State to DreamPak.

As exhibit 6 to his supplementary declaration, Dr. Labuza attached a printout of an Internet website produced by the Pharmaceutics Laboratory of the School of Pharmacy at the University of North

Carolina in Chapel Hill.[10] The website is particularly relevant to this dispute, since Vital State made frequent claims that it had discovered the secret of producing a pharmaceutical gummy product. The website provides detailed instructions for the formulation of pharmaceutical gummy products, and gives a sample formula that includes a drug, gelatin, and glycerin.[11] Although the formula does not include high fructose corn syrup, the website strongly challenges Vital State's claim of discovery of the secret of producing a pharmaceutical gummy product.

These four groups of evidence strongly support DreamPak's contention that the claimed trade secrets were or are now all generally known to the public. Vital State has not presented any evidence to refute this contention, nor offered the Court any reason to reject any of this evidence.[12] Vital State has the burden of proving that its confidential information meets the legal standards for trade secret

status, and a key element of that standard is that the information not be generally known to others. Vital State has failed to establish a likelihood of success in showing that the claimed proprietary information meets this key requirement for protection as trade secrets. Having failed to show a likelihood of success in establishing the existence of trade secrets, Vital State has not shown a likelihood of success in prevailing on its second cause of action for misappropriation of trade secrets.

### 3. Vital State has not demonstrated a likelihood of success in showing breach of the Confidentiality Agreement.

Vital State's first cause of action alleges that DreamPak has breached the Confidentiality Agreement. Vital State has not established a likelihood of success in showing that DreamPak breached that agreement. As discussed above, provisions 5(a) and 5(b) operate so as to release

---

10. http://pharmlabs.unc.edu/lozenge/text.htm.

11. In its post-hearing memorandum, Vital State argues that its pharmaceutical gummy differs from the pharmaceutical gummy disclosed on the website. This argument, if true, points to their failure to adequately define the bounds of their proprietary information: if Vital State has claimed a unique technology to manufacture successfully a pharmaceutical gummy product, but then argues that the website's pharmaceutical gummy product is different, their definition must insufficiently set the boundaries of the claimed concept.

12. Vital State offered only a meritless estoppel argument to urge the Court to reject this evidence. Vital State maintains that Dr. Gamay has filed patent applications claiming discoveries identical to Vital State's trade secrets, and that these applications assert that this information is unknown in the prior art. Vital State argues that DreamPak should be now estopped from asserting the opposite, that the information is known in the prior art. At oral argument, Vital State did not specify

whether they were using the concept of equitable estoppel or of judicial estoppel. In their post-hearing brief, they relied on judicial estoppel. In *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777 (3d Cir.2001), the Third Circuit defined the requirements for arguing judicial estoppel: "Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." Vital State has not provided argument for all three factors, no less argued persuasively. An equitable estoppel argument fails as a matter of hornbook law: the doctrine of equitable estoppel requires a showing of detrimental reliance. 28 Am.Jur.2d Estoppel and Waiver § 40. Vital State could never prove that it relied on confidential patent applications to its detriment, and so it cannot invoke the doctrine of equitable estoppel.

DreamPak from all obligations under the agreement concerning information known to the public. Because Vital State has failed to counter the evidence presented by DreamPak that leads to the inference that the claimed trade secrets were, or have become, known to the public, and thus that Vital State released DreamPak from its obligations under the agreement, Vital State has not shown a likelihood of success in establishing that DreamPak breached any obligations created by the agreement.

Vital State's failure to demonstrate a likelihood of success on the merits for its first and second causes of action alleviates the need to address the other three factors of the preliminary injunction standard. Vital State's application for a preliminary injunction must be denied.

## III. DreamPak's Application for a Preliminary Injunction

### A. Threshold Issue: Choice of Law

Under the New Jersey choice of law analysis, the first step involves determining whether a conflict exists between the laws of the interested states. Vital State argues that Quebec law should govern DreamPak's application, while DreamPak argues that Wisconsin law should govern. A decision may be made on the present injunction application without finding a conflict of laws and reaching the second step of the analysis: DreamPak's application fails because DreamPak has not shown a likelihood of success in proving a key element, the use by Vital State of its trade secret, and the laws of Quebec and

Wisconsin do not differ in regard to this element. Both the actions for misappropriation of trade secrets and for breach of contract rest on this core element.[13]

Although Quebec differs from Wisconsin in the kinds of actions a party may bring to protect trade secrets, both jurisdictions share the fundamental notion that injunctive relief requires a showing of use of such information. The common law of Quebec recognizes actions for injunctive protection of trade secrets against use. *See, e.g., Devoe–Holbein Inc. et al. v. Yam et al.*, 1984 CarswellQue 87 (Quebec Superior Court 1984). Wisconsin has statutory law that recognizes an action for injunctive protection of trade secrets against use. Wis. Stat. § 134.90(3) (2001–02). As such, no conflict exists between the law of the interested states, and the Court need not reach the second step of the choice of law analysis.

### B. DreamPak has not demonstrated a likelihood of success on the merits.

#### 1. DreamPak has not demonstrated a likelihood of success in proving Vital State's misappropriation through use of its trade secret.

▮ In its memorandum of law in support of its motion for a preliminary injunction, DreamPak claimed three trade secrets: 1) the Gel Delivery System; 2) the Creatine Gelatin formula; and 3) the Creatine Gel/Actijube product. It did not explain in any detail what these secrets consisted of.

---

**13.** Moreover, Quebec law does not recognize actions for misappropriation of trade secrets. As the Quebec Court of Appeal explained in *Tri–Tex Co. v. Ghaly*, 1 C.P.R. (4th) 160 (Quebec Sup.Ct.1999), Canadian courts have not conclusively accepted a theory of confidential information as property. In the United States, misappropriation of trade secrets is based on a concept of trade secrets as property that can be stolen. Canadian law, on the other hand, is based on theories such as breach of the duty of confidence, which are not property theories. Quebec courts would recognize the action for breach of contract, however.

In its reply brief in support of its motion for a preliminary injunction, DreamPak gave its first detailed explanation of the trade secrets it claimed. It stated that, in helping Vital State to change its 4/18 formula for successful production, it taught six elements of the Gel Delivery System: 1) changing the sequencing of ingredients by combining all syrup together with the gelatin to increase hydration of the gelatin, improving flowability and texture; 2) increasing moisture; 3) increasing the ratio of high fructose corn syrup to corn syrup; 4) adding high-shear mixing; 5) adding steam-injection cooking; and 6) changing the formula to remove the bitter taste.

At the September 24, 2003 hearing, DreamPak claimed these same items as trade secret elements taught to Vital State, but with two differences: 1) it no longer claimed the change in the corn syrup ratio, and 2) it claimed a proprietary mold design. DreamPak's counsel also stated, "I would grant you a lot of the individual aspects of what we taught them in and of themselves are not trade secrets ... [I]t is the collection of these items that forms the technology." (Hearing Transcript—pp. 41–42). This assertion that the trade secret is the combination of the elements is crucial to this motion, since it means that, to prove use of the trade secret, DreamPak must prove use of each and every element in combination.

In the amended complaint, Vital State stated that it chose Confab to manufacture Actijube, and that Confab is preparing to manufacture a commercial order for the product. DreamPak claims that Vital State is using its trade secret, but has offered the Court very little as evidence of this; it has not even alleged a detailed scenario of use. In its memorandum of law in support of its motion for preliminary injunction, DreamPak alleged vaguely that Vital State used the trade secret in

dealings with Adam Morgan, Vice–President of New Business Development for Rexall Sundown. The memorandum does not clearly state how Vital State's contacts with Morgan show use of the trade secret, nor does the Morgan Declaration provide significant evidence to support that inference: Morgan merely stated that he received product samples for a creatine-based Actijube from Vital State and for Creatine Crunch from Temco Packaging, and that the samples appeared "virtually identical." (Morgan Dec. ¶ 16). Much more is needed to show a likelihood of success in demonstrating that Vital State's samples made use of DreamPak's claimed combination of elements such as corn syrup ratios and high-shear mixing.

DreamPak's reply brief alleged further use, stating that Vital State had emailed Confab a formula "substantially identical to the formula used at the DreamPak trial run." (Reply Brief—p. 6). The Lodato declaration claims that Exhibit 6 is a copy of this email. Again, even if these statements are taken as true, they still fall far short of establishing Vital State's use of DreamPak's claimed combination of elements: the email is a list of ingredients and quantities, saying nothing about the process steps of high-shear mixing and steam-injection cooking, nor mold design.

At the September 24, 2003 hearing, DreamPak admitted that it had not yet had the opportunity to depose anyone from Confab to find out about the manufacturing of Vital State's product. (Hearing Transcript—p. 85). DreamPak did not elaborate on its allegations of use. It did point to a Vital State formula dated July 17, 2003, claiming that it was virtually identical to a formula established on June 4, 2002, the product of the combined efforts of DreamPak and Vital State (Lodato Dec.—Ex. 4). Vital State replied that July 17, 2003 was merely the date it was print-

ed out and that it was not a formula currently in use. DreamPak presented no other evidence of Vital State's current or recent use, and as such it did not refute Vital State's denial of use. Yet, even if DreamPak could show that this was a formula in current use, the printout offered does not show every element of the combination claimed as a trade secret: it does not clearly evidence any of the changes DreamPak claimed as constituting its trade secret, much less the combination of all together.

DreamPak has offered the Court little to support an inference that Vital State is using the combination claimed as a trade secret. DreamPak has not even alleged a detailed scenario of use, much less offered evidence supporting it. Given that it claims a combination of elements that includes manufacturing steps, it is not surprising that it is unable to show use prior to discovery of Confab's manufacturing process. DreamPak has not shown a likelihood of success in proving that Vital State is using the combination of elements it claims as a trade secret.

**2. DreamPak has not demonstrated a likelihood of success in showing breach of the Confidentiality Agreement.**

The Confidentiality Agreement restricts the use of confidential information. Paragraph 4 states: "Each party shall use the Confidential Information of the other Party only for the Purpose outlined herein." The Agreement defines "Purpose" as "evaluating whether the products of Vital State can run effectively on DreamPak's production and packaging equipment." Thus, to demonstrate a breach of the agreement, DreamPak must show that Vital State has used confidential information for a purpose outside that defined by the agreement. As discussed above, Dream-

Pak has not shown a likelihood of success in proving use of the claimed trade secret. DreamPak has not argued that, for purposes of its breach of Confidentiality Agreement claim, the information considered confidential information under the agreement differs from what it has claimed as a trade secret under its misappropriation claim. As such, it has not shown a likelihood of success in proving use of confidential information in breach of the agreement.

Because DreamPak has not demonstrated a likelihood of success on the merits for its first and second causes of action, the Court need not reach the other three factors of the preliminary injunction standard. DreamPak's application for a preliminary injunction must be denied.

## CONCLUSION

For the reasons set forth above, Vital State's application for a preliminary injunction is DENIED, and DreamPak's application for a preliminary injunction is DENIED. The orders of this Court entered on April 28, 2003; April 30, 2003; and June 23, 2003 are VACATED in all respects, other than the granting of *pro hac vice* status to Paul R. Levenson and Ashima Aggarwal. The order of this Court entered on October 28, 2003 is VACATED as to the temporary restraints on Temco Packaging, Inc. and Charles Goldberg.